UNITED STATES of America, Plaintiff,

v.

READER'S DIGEST ASSOCIATION, INC., Defendant.

Civ. A. No. 75–184.

United States District Court, D. Delaware.

Nov. 28, 1978.

As Amended March 20, 1979.

James W. Garvin, Jr., U. S. Atty., Wilmington, Del., and James A. Calderwood, Atty., Dept. of Justice, Washington, D. C., for plaintiff.

R. Franklin Balotti and Donald A. Bussard of Richards, Layton & Finger, Wilmington, Del., and John B. Kuhns of Williams & Connolly, Washington, D. C., for defendant.

## OPINION

LATCHUM, Chief Judge.

This is an action brought by the United States of America (the "Government") against Reader's Digest Association, Inc. ("Reader's Digest") to obtain injunctive relief and recover civil penalties pursuant to sections 5(*l*) and 16(a)(1) of the Federal Trade Commission Act (the "Act"),[1] for al-

---

1. 15 U.S.C. §§ 45(*l*) and 56(a)(1) (1976). Section 5(*l*) provides:

(*l*) Any person, partnership, or corporation who violates an order of the Commission after

leged violations of a consent order. The order required Reader's Digest, which regularly uses a promotional device known as a "sweepstakes" in its business of selling and distributing magazines, books and other products, to cease and desist from engaging in various practices in connection with any sweepstakes or other similar promotional device. Among the practices proscribed were the use or distribution of "simulated checks" or "any confusingly simulated item of value."[2] The complaint alleges that Reader's Digest violated the order by distributing an item labeled a "TRAVEL CHECK" and another item labeled a "CASH–CONVERTIBLE BOND" in connection with two different sweepstakes.

 The principal issues in a civil penalty action are whether the defendant violated the FTC order in question and, if so, what amount of money should be assessed as a penalty.[3] This case is presently before the Court on Reader's Digest's motion for summary judgment and the Government's motion for partial summary judgment on the issue of liability and to strike two affirmative defenses raised by Reader's Digest in its answer.[4] The challenged defenses are: (1) that the FTC violated Reader's Digest's constitutional right to substantive

and procedural due process by implementing and interpreting the consent order in an arbitrary and capricious manner and (2) that the Government's claims are barred by laches, waiver and estoppel.[5] The defendant also denies that it violated the consent order.

 To the extent that Reader's Digest's affirmative defenses do not overlap with its more general denial of liability, the Court concludes that they do not provide a basis for avoiding liability in this case.[6] The defendant has cited no authority for the proposition that the due process clause requires the FTC to afford those subject to a consent order notice and a hearing prior to instituting a civil penalty action, and the Court has found none. The courts that have addressed the issue have refused to impose such a requirement.[7] The equitable defenses of laches, waiver and estoppel have no application here, because they are based on actions taken in the public interest by members of the Commission's staff. See *FTC v. Algoma Lumber Co.*, 291 U.S. 67, 80, 54 S.Ct. 315, 78 L.Ed. 655 (1933); *United States v. Vulcanized Rubber & Plastics Co.*, 178 F.Supp. 723, 726 (E.D.Pa.1959). Similarly, Reader's Digest's good faith or lack of intent has no bearing on the question of

it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the Attorney General of the United States. . . . In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission.

Section 16(a)(1) of the Act authorizes the Federal Trade Commission ("FTC" or the "Commission") to commence a civil penalty action in its own name in the event the Attorney General fails to do so within 45 days after receipt of written notice from the Commission.

2. Docket Item 1, ex. A, par. II.C(3).

3. Section 5(l) of the Act authorizes imposition of a civil penalty of "not more than $10,000 for each violation" of an order of the FTC. The actual amount of the penalty, provided it does not exceed the statutory maximum, is left to the informed discretion of the district court

judge. *United States v. J. B. Williams Co.*, 498 F.2d 414, 438 (C.A.2, 1974).

4. Docket Items 35 and 14.

5. Docket Item 4, pars. 11 and 12; Docket Item 9, Answers to Plaintiff's Interrogatories, Nos. 10 and 11.

6. Reader's Digest effectively conceded as much in its opening brief, contending only that the motion to strike is premature because the affirmative defenses would be relevant to the penalty issue should liability be found. Docket Item 37, p. 2 note.

7. See *United States v. J. B. Williams Co., supra*, 498 F.2d at 434–35; *United States v. Beatrice Foods Co.*, 493 F.2d 1259, 1265–69 (C.A.8, 1974).

The Commission's regulations expressly provide that it may institute civil penalty proceedings to enforce compliance with an order "without prior notice of any kind to a respondent." 15 C.F.R. § 3.61.

liability in this civil penalty action. *United States v. Ancorp National Services, Inc.,* 516 F.2d 198, 202 (C.A.2, 1975); *United States v. Vitasafe Corp.,* 212 F.Supp. 397 (S.D.N.Y.1962); *United States v. Karns,* 1963 Trade Cases ¶ 70,950 (S.D.N.Y.1963).

 The Court will deny the motion to strike the affirmative defenses, however, for two reasons. First, the good faith of the defendant and the alleged lack of notice are among the factors to be considered by the Court in determining the penalty, if any, to be imposed. *See United States v. Papercraft Corp.,* 540 F.2d 131, 141 (C.A.3, 1976); *United States v. Ancorp National Services, Inc., supra,* 516 F.2d at 202; *United States v. Wilson Chemical Co.,* 1962 Trade Cases ¶ 70,478 (W.D.Pa.1962), *aff'd,* 319 F.2d 133 (C.A.3, 1963). Second, this case is not unduly complicated and the Government has not shown that it is prejudiced in any way by the presence of the challenged defenses. *See Tivoli Realty, Inc. v. Paramount Pictures, Inc.,* 80 F.Supp. 800, 803 (D.Del.1948); 2A Moore's Federal Practice ¶ 12.21, p. 2431 & n. 30 (2d ed. 1975).

The Court now turns to the sole issue presented by the pending cross-motions for summary judgment; that is, whether the distribution by Reader's Digest of the Travel Check or Cash-Convertible Bond or both violated the terms of the consent order.

## BACKGROUND

Congress has directed the FTC "to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in or affecting commerce and unfair or deceptive acts or practices in or affecting commerce."[8] Acting pursuant to this mandate, the FTC conducted an investigation in 1970 of the practices employed by Reader's Digest and several other corporations in connection with various promotional sweepstakes. Ultimately, the Commission notified Reader's Digest that it intended to issue a complaint against the company alleging that some of its practices were unfair or deceptive and therefore in violation of section 5 of the Act. Settlement negotiations ensued and resulted in a consent order in which Reader's Digest agreed to cease and desist from most of the practices mentioned in the complaint. The consent order together with the proposed FTC complaint were issued on November 2, 1971.[9] The order became final on January 15, 1972 and, except for a modification on March 5, 1974 in respects not material to this action, the order has been in full force from that date to the present time.[10]

Paragraph II.C(3) of the consent order provides:

## II

IT IS ORDERED that Reader's Digest Association, Inc., a corporation, and its officers, agents, representatives and employees, directly or through any corporate or other device, in connection with the publication, advertising, offering for sale, sale or distribution of magazines, books, or other products in commerce as "commerce" is defined in the Federal Trade Commission Act, cease and desist from:

C. . . . .

(3) Using or distributing simulated checks, currency, "new car certificates;" or using or distributing any confusingly simulated item of value.

The Government contends that two different items distributed by Reader's Digest in connection with the offering for sale of Reader's Digest magazine contravened

---

**8.** Section 5(a)(2) of the Act, 15 U.S.C. § 45(a)(2) (1976). At the time the consent order was issued, the authorization quoted in the text applied only to acts or practices "in commerce" and was codified at 15 U.S.C. § 45(a)(6) (1970). *See* Pub.L. No. 94–145, § 3, 89 Stat. 801 (1975); Pub.L. No. 93–637, § 201(a), 88 Stat. 2193 (1974).

**9.** FTC Docket C–2075, reported at 79 FTC Decisions 696. The consent order and the administrative complaint are attached to the complaint in this action (Docket Item 1) as exhibits A and B.

**10.** Docket Items 1 and 4, par. 5. The procedure governing the development and issuance of consent orders is set forth in 15 C.F.R. Subpart C, §§ 2.31 *et seq.*

Paragraph II.C(3). The first item, a "TRAVEL CHECK", was distributed during the first half of 1973 as part of a twelve-page promotional pamphlet called a "Sweepstakes Passport." [11] The Travel Check is printed on light green and blue paper, is approximately the same size as a real traveler's check, has traditional check-style borders, and purports to be for "100 Dollars a Month for Life." [12] The Government alleges that the Travel Check violates the proscription against the use of "simulated checks."

The second item is labeled a "CASH–CONVERTIBLE BOND" and it was part of a packet of sweepstakes literature distributed in November, 1973 and October, 1974.[13] As with the Travel Check, the Bond is printed against an official looking background.[14] The Government contends the Cash-Convertible Bond is a "confusingly simulated item of value" within the meaning of Paragraph II.C(3) of the consent order.

To decide whether the Travel Check or the Cash-Convertible Bond violated the order, the Court must engage in a two-step analysis: (1) determining what the order means and (2) deciding whether the challenged advertisements come within the order as construed. *United States v. J. B. Williams Co., supra,* 498 F.2d at 430–31. Furthermore, in an action to recover civil penalties the court's role is not to determine whether the challenged practice is deceptive, but merely to consider whether the practice falls within the order's proscription. *United States v. Vulcanized Rubber & Plastics Co.,* 288 F.2d 257, 258 n. 2 (C.A.3, 1961); *see United States v. Morton Salt Co.,* 334 U.S. 37, 54, 68 S.Ct. 822, 92 L.Ed. 420 (1948). A dispute exists in this case, however, as to whether Paragraph II.C(3) should be construed to require some proof that prohibited advertisements actually cause consumer confusion or deception. No evidence of actual confusion has been presented with respect to either of the items in question here.

## I. REQUIREMENT OF PROOF OF CONFUSION

Reader's Digest contends that the order should be construed to require at least some evidence of actual confusion or deception before an advertisement can be found to have violated the ban against using "simulated checks" or "confusingly simulated items of value." Reader's Digest points to two different sources for such an evidentiary requirement. First, it argues that the consent order by its own terms requires proof of confusion. In the alternative, it contends that the recently recognized right of commercial speech to First Amendment protection requires that the consent order be construed narrowly to require proof of confusion. The Court will consider these contentions in turn.

### A. *The Consent Order*

Paragraph II.C(3) requires Reader's Digest to cease and desist from:

(3) Using or distributing simulated checks, currency, "new car certificates;" or using or distributing any confusingly simulated item of value.

The prohibition is not a model of clarity and the word "confusingly" in the second clause accounts for much of the ambiguity. It is not clear from the face of the order whether the adjective "confusingly" was intended

---

11. Between February 26 and June 30, 1973, Reader's Digest sent out 13,898,521 of the Travel Checks. Docket Item 9, Answers to Plaintiff's Interrogatories, No. 3(b).

12. A copy of the Travel Check appears as exhibit 1 in the appendix to this opinion.

13. A total of 4,042,000 of the Cash-Convertible Bonds were sent out by Reader's Digest. Docket Item 9, Answers to Plaintiff's Interrogatories, No. 3(b).

14. A copy of the Cash-Convertible Bond appears as exhibit 2 in the appendix to this opinion. Reader's Digest enclosed three different Bonds in each sweepstakes packet having face values of one hundred dollars a month for life, $2,000 a month for a year and $24,000, respectively. The three Bonds have slightly different formats but the differences are immaterial for purposes of this litigation.

to modify the items mentioned in the first clause of Paragraph II.C(3) as well as the second. More importantly, the language of the order does not indicate whether or not the term "confusingly" was meant to impose upon the FTC the burden of proving actual confusion to establish a violation. Resolution of these ambiguities depends upon the intentions of the FTC and Reader's Digest at the time they entered into the consent order.

The agreement containing the consent cease and desist order at issue here provides that: "The complaint may be used in construing the terms of the order." [15] The administrative complaint is particularly helpful in construing Paragraph II.C(3). In Paragraph 5 of the complaint, the Commission reproduced among other things a "check" for $100 dollars a month for life and a "New Car Certificate" for a 1970 Ford Mustang as being typical and illustrative of the statements and representations made by Reader's Digest in its sweepstakes.[16] The complaint further alleged:

PARAGRAPH SIX: By and through the use of the above-quoted statements and representations, and others of similar import and meaning not expressly set out herein, respondent represented directly or by implication, that:

\* \* \* \* \* \*

(q) Simulated checks, "money" and other negotiable instruments and simulated "New Car Certificates" received by individuals from the respondent are valuable and can be cashed, redeemed, or exchanged for United States currency or for a new car.[17]

The complaint concludes with the averment that the aforesaid practices and others not relevant to this action have "the capacity and tendency to mislead members of the purchasing public . . . and ha[ve] induced many members of the public to par-

ticipate in respondent's 'sweepstakes'," and are therefore unfair and deceptive acts or practices in violation of section 5 of the Act.[18]

■■■■ A cease and desist order must be interpreted in light of its principal purpose. *United States v. J. B. Williams Corp., supra,* 498 F.2d at 431. When viewed in light of the administrative complaint, it is obvious that Paragraph II.C(3) was intended to prevent the distribution of simulated checks, money and new car certificates similar to those contained in the complaint and all *other* confusingly simulated items of value.[19] In other words, the adjective "confusingly" was meant to modify the specific items mentioned in the first clause of the paragraph and those items are simply examples of material generically described in the second clause as "confusingly simulated item[s] of value."

■■■■ Reader's Digest would construe the phrase "confusingly simulated item of value" to encompass only items that can be shown to have confused consumers. That is not the only possible construction, however, and the Court concludes that it does not reflect the parties' original intention. If the Government were seeking to enforce the Act's prohibition of unfair or deceptive advertising in an original administrative proceeding, it would be required to prove only that the challenged material has a tendency or capacity to deceive. Thus, the Commission's findings have been sustained despite the absence of evidence that the challenged advertising actually misled or confused customers. *See Beneficial Corp. v. FTC,* 542 F.2d 611, 617 (C.A.3, 1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977). Where, as here, the Commission issued an administrative complaint reflecting its belief that certain practices were deceptive or confusing, and then

---

**15.** Docket Item 1, ex. C, par. 6.

**16.** Docket Item 1, ex. B, pp. 6–8. A copy of the "check" shown in the administrative complaint appears as exhibit 3 in the appendix to this opinion.

**17.** *Id.* pp. 9–10.

**18.** *Id.* p. 14.

**19.** The parties do not disagree with this interpretation; they differ as to the importance of the term "confusingly."

entered into a consent order which required the respondent to cease and desist from employing those and similar practices, it is extremely unlikely that the Commission intended to subject itself to a more rigid evidentiary burden. Nothing in the record suggests that the Commission so intended.

▆▆▆ Rather, the Court finds that the Commission used the phrase "confusingly simulated" in the second clause of Paragraph II.C(3) in an attempt to generalize the proscription contained in the first clause. As the Supreme Court stated in *FTC v. Ruberoid Co.,* 343 U.S. 470, 473, 72 S.Ct. 800, 803, 96 L.Ed. 1081 (1952):

> If the Commission is to attain the objectives Congress envisioned, it cannot be required to confine its road block to the narrow lane the transgressor has traveled; it must be allowed effectively to close all roads to the prohibited goal, so that its order may not be by-passed with impunity.

The Commission had the authority to frame its order broadly to prevent Reader's Digest from engaging in similarly illegal practices in future advertisements. And having decided to enter into a consent order rather than contest the FTC's complaint, Reader's Digest "must expect some fencing in." *FTC v. Colgate-Palmolive Co.,* 380 U.S. 374, 395, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965); see *FTC v. National Lead Co.,* 352 U.S. 419, 428–30, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957); *Jacob Siegel Co. v. FTC,* 327 U.S. 608, 611, 66 S.Ct. 758, 90 L.Ed. 888 (1946).

▆▆ The prohibited goal in this case was the inducement of participation in sweepstakes by means of items that appeared to be valuable but in fact were not. The Court holds that the phrase "confusingly simulated item of value" in the consent order was meant to apply to advertising material that is similar to the items mentioned in the complaint and, on its face, could be said to have the same capacity or tendency to mislead consumers. Thus, the Court rejects Reader's Digest's argument that the language of the consent order should be construed to require proof of actual confusion to support a finding that either the Travel Check or the Cash-Convertible Bond violated the order.

Nevertheless, if Reader's Digest is correct in its contention that the First Amendment requires proof of confusion or deception before commercial speech can be restrained, the Court would have to resolve the ambiguity in the language of Paragraph II.C(3) in favor of such a requirement.

### B. *First Amendment*

In 1942 the Supreme Court held that the First Amendment does not protect "purely commercial advertising" from government regulation.[20] Although the principle that commercial speech is unprotected was questioned and undermined by a few later decisions,[21] it survived until 1976, when the Court held in *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Coun-*

---

20. *Valentine v. Chrestensen,* 316 U.S. 52, 62 S.Ct. 920, 86 L.Ed. 1262 (1942).

21. For example, in a concurring opinion in *Cammarano v. United States,* 358 U.S. 498, 514, 79 S.Ct. 524, 3 L.Ed.2d 462 (1959), Justice Douglas described the *Chrestensen* ruling as being "casual, almost offhand." The Court expressly declined to rely on an absolute rule that commercial speech is unprotected in *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations,* 413 U.S. 376, 93 S.Ct. 2553, 37 L.Ed.2d 669 (1973). There the Court upheld an ordinance prohibiting sex-designated help-wanted advertisements on the more narrow ground that the commercial activity in question was itself illegal. 413 U.S. at 388–89, 93 S.Ct. 2553. Lastly, the demise of the commercial speech exception was foreshadowed in *Bigelow*

*v. Virginia,* 421 U.S. 809, 95 S.Ct. 2222, 44 L.Ed.2d 600 (1975), in which the Court reversed the conviction of a Virginia newspaper editor under a Virginia statute for publishing an advertisement concerning the availability of legal abortion services in New York. The Court in *Bigelow* rejected the proposition that advertising is unprotected per se, but then distinguished *Chrestensen* on the ground that the abortion advertisement communicated information of public interest and thus was not "purely commercial." 421 U.S. at 818–25, 93 S.Ct. 2553. *See generally* Meiklejohn, *Commercial Speech and the First Amendment: An Emerging Doctrine,* 5 Hof.L.Rev. 655 (1977); Redish, *The First Amendment in the Marketplace: Commercial Speech and the Values of Free Expression,* 39 Geo.Wash.L.Rev. 429 (1971).

*cil, Inc.,* 425 U.S. 748, 761–62, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346, that "speech which does 'no more than propose a commercial transaction'" is not "wholly outside the protection of the First Amendment."

Before exploring the contours of the First Amendment interests in this case, the Court must determine whether Reader's Digest has waived its right to challenge the order on First Amendment grounds. In 1971, when it entered into the consent order, Reader's Digest waived its right to:

(a) Any further procedural steps;

(b) The requirement that the Commission's decision contain a statement of findings of fact and conclusions of law; and

(c) All rights to seek judicial review or otherwise to challenge or contest the validity of the order entered pursuant to this agreement.[22]

Reader's Digest contends that it should not be held to have waived its First Amendment argument, because advertising did not enjoy First Amendment protection until five years after the consent order was issued. The Court agrees.

A waiver is "an intentional relinquishment . . . of a *known* right or privilege." *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938) (emphasis supplied). In *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967), a majority of the Justices of the Supreme Court found that no waiver had occurred in circumstances simi-

lar to those in this case. The *Curtis* case involved an action for defamation of a public figure; the defendant had asserted no constitutional defenses before trial. Shortly after the verdict was returned, the Supreme Court decided *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), holding that the First Amendment requires proof of "actual malice" before a public official may recover damages for a defamatory falsehood. *Id.* at 279–80, 84 S.Ct. 710. Justice Harlan, writing for the plurality in *Curtis Publishing,* concluded that the defendant had not waived its right to assert the previously unrecognized constitutional arguments by failing to assert them before trial. 388 U.S. at 142–45, 87 S.Ct. 1975.[23] He also stated that:

> Where the ultimate effect of sustaining a claim of waiver might be an imposition on that valued freedom [of speech], we are unwilling to find waiver in circumstances which fall short of being clear and compelling.

*Id.* at 145, 87 S.Ct. at 1986. Prior to 1976, "purely commercial speech" like the Travel Check or Cash-Convertible Bond at issue here was not afforded First Amendment protection. *See Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., supra,* 425 U.S. at 758–61, 96 S.Ct. 1817. Therefore, for the reasons stated in *Curtis Publishing, supra,* the Court concludes that Reader's Digest did not waive its right to challenge the consent order on First Amendment grounds.[24]

---

**22.** Docket Item 1, ex. C, par. 3.

**23.** At least two other Justices expressed approval of the plurality's requirement of a knowing waiver in *Curtis.* 388 U.S. at 172 n. 1, 87 S.Ct. 1975 (Brennan, J., with White, J., dissenting); *see id.* at 167–68, 87 S.Ct. 1975 (Warren, C. J., concurring).

**24.** *See generally* Comment, *Waiver of a Previously Unrecognized Defense: Must Lawyers Be Seers,* 114 U.Pa.L.Rev. 451 (1966).

The fact that a consent order is involved in this case does not compel a different result. *See United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932) (court of equity has power to modify a consent order); *United States v. Marchetti,* 466 F.2d 1309, 1317

(C.A.4), *cert. denied,* 409 U.S. 1063, 93 S.Ct. 553, 34 L.Ed.2d 516 (1972) (one who contracts with the Government cannot unknowingly waive his First Amendment rights).

Of course, a newly recognized constitutional argument also must be asserted seasonably. In this case, the civil penalty action was commenced in July, 1975; *Virginia Board of Pharmacy* was not decided until May, 1976. Under the FTC's regulations, Reader's Digest could have petitioned for a reopening of the original administrative proceeding on the basis of a change in the law. 15 C.F.R. § 372(b)(2). Because the parties have not addressed the need for administrative exhaustion with respect to the First Amendment issue, the Court will not

Turning to the merits of Reader's Digest's constitutional argument, the Court notes first that some forms of commercial speech regulation are still permissible. Appropriate time, place and manner restrictions may be imposed on commercial speech and false or misleading advertisements may be forbidden. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., supra,* 425 U.S. at 770–72, 96 S.Ct. 1817; *Bates v. State Bar of Arizona,* 433 U.S. 350, 383–84, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); *Linmark Associates, Inc. v. Township of Willingboro,* 431 U.S. 85, 93–94, 98, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977). In *Virginia Board of Pharmacy* the Court observed:

> Obviously, much commercial speech is not provably false, or even wholly false, but only deceptive or misleading. We foresee no obstacle to a State's dealing effectively with this problem. The First Amendment, as we construe it today, does not prohibit the State from insuring that the stream of commercial information flow cleanly as well as freely.

425 U.S. at 771–72, 96 S.Ct. at 1830 (footnote omitted). Reader's Digest does not contest the authority of the Government to prohibit the use of deceptive advertising. Instead, it argues that to justify the prohibition against the use of a particular advertisement, the Government must produce at least some evidence that the advertisement actually deceived consumers. To support this position, Reader's Digest cites *Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), which struck down a disciplinary rule prohibiting lawyers from advertising in newspapers. In *Bates,* the State Bar attempted to justify the ban on *all* lawyer advertising on the ground that such advertising is inherently misleading. The Court examined that justification and found that, in fact, it was not true. *Id.* at 372–75, 97 S.Ct. 2691. The Court also found no support in the record for the State Bar's contention that the particular advertisement at issue in *Bates* was misleading.

Thus, the advertisement was held to be protected by the First Amendment and not subject to restraint. *Id.* at 381–82, 97 S.Ct. 2691.

The instant case is distinguishable from *Bates* in two important respects. The first distinction derives from the different procedural postures of the two cases. The factual predicate for Paragraph II.C(3) of the consent order is the FTC's belief that the simulated check and new car certificate included in the administrative complaint are deceptive. Reader's Digest could have challenged the FTC's belief in an administrative hearing and then obtained judicial review of an adverse decision under the substantial evidence test. *See Beneficial Corp. v. FTC, supra,* 542 F.2d at 616–18. However, by entering into the consent order, the defendant relinquished its right to contend that the items mentioned in the original complaint were not deceptive and in violation of section 5 of the Act. *See FTC v. Jantzen, Inc.,* 383 F.2d 981, 983 (C.A.9, 1967); *United States v. Vitasafe Corp.,* 212 F.Supp. 397, 398 (S.D.N.Y.1962) and 234 F.Supp. 710, 711 & n. 2 (S.D.N.Y.1964), *aff'd,* 352 F.2d 62 (C.A.2, 1965). Therefore, this Court will assume that the check and the new car certificate were deceptive. In contrast to the situation in *Bates* then, there is at least some basis in the record of this case for concluding that the advertising being regulated is deceptive.

The second distinguishing factor between this case and *Bates* is the nature of the regulation being challenged. The *Bates* case involved a prohibition against the publication of a "truthful advertisement concerning the availability and terms of routine legal services." The Court ruled "simply that the flow of such information may not be restrained." 433 U.S. at 384, 97 S.Ct. at 2709. The ban in Paragraph II.C(3) on the use of "any confusingly simulated item of value," on the other hand, does not restrain Reader's Digest from communicat-

consider it. *See Warner-Lambert Co. v. FTC,* 562 F.2d 749, 770–71 & n. 8 (C.A.D.C.1977)

(supplemental hearing on petition for rehearing).

ing the terms of its sweepstakes promotions to the public. The consent order merely prohibits the communication of such information in a form that the Government considers misleading or deceptive. Paragraph II.C(3), therefore, represents a restriction on the manner of speech that Reader's Digest may use to convey its message, rather than a restriction on the content of the message. "This distinction is not without significance to First Amendment analysis, since laws regulating the time, place or manner of speech stand on a different footing from laws prohibiting speech altogether." *Linmark Associates, Inc. v. Township of Willingboro, supra*, 431 U.S. at 93, 97 S.Ct. at 1618.

The other cases Reader's Digest relies upon to support its argument that to establish a violation the Government must produce at least some evidence that the Travel Check and the Cash-Convertible Bond in fact deceived or confused consumers are also inapposite. None of those cases involved "purely commercial speech," [25] while the instant case does. In *Virginia Board of Pharmacy*, the Court stated that:

> There are commonsense differences between speech that does "no more than propose a commercial transaction" . . . and other varieties. . . . [, which] suggest that a different degree of protection is necessary to insure that the flow of truthful and legitimate commercial information is unimpaired. . . . [C]ommercial speech may be more durable than other kinds. Since advertising is the *sine qua non* of commercial profits, there is little likelihood of its being chilled by proper regulation and foregone entirely. ·

> Attributes such as these, the greater objectivity and hardiness of commercial speech, may make it less necessary to tolerate inaccurate statements for fear of silencing the speaker. . . . *They may also make it appropriate to require that a commercial message appear in such a form, or include such additional information, warnings and disclaimers, as are necessary to prevent its being deceptive. . . . They may also make inapplicable the prohibition against prior restraints.*

425 U.S. at 771–72 n. 24, 96 S.Ct. at 1830 n. 24 (citations omitted) (emphasis supplied).[26] In a more recent case the Court again recognized the "commonsense differences" between commercial and other speech, stating that it has

> afforded commercial speech a limited measure of protection, commensurate with its subordinate position in the scale of First Amendment values, while allowing modes of regulation that might be impermissible in the realm of non-commercial expression.

*Ohralik v. Ohio State Bar Association*, 436 U.S. 447, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978); *see Bates v. State Bar of Arizona, supra*, 433 U.S. at 383, 97 S.Ct. 2691; *Linmark Associates, Inc. v. Township of Willingboro, supra*, 431 U.S. at 98, 97 S.Ct. 1614.

---

**25.** Reader's Digest cited *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), which involved a statute prohibiting banks from expending funds for the purpose of influencing the vote on referendums not affecting their business interests. The other two cases cited bear even less relation to the issues before this Court. *See Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Wood v. Georgia*, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962).

**26.** Justice Stewart expanded upon this theme in a concurring opinion in the *Virginia Board of Pharmacy* case. 425 U.S. at 777–81, 96 S.Ct. 1817.

The precise effect of the recently recognized right of commercial speech to First Amendment protection on the ability of the FTC to carry out its mandate to prevent "unfair or deceptive acts or practices in or affecting commerce" is not yet clear. A few commentators have explored the issue and come to different conclusions. *See* Reich, *Consumer Protection and the First Amendment: A Dilemma for the FTC?* 61 Minn.L.Rev. 705 (1977); Note, *Yes, FTC, There is a Virginia: The Impact of Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc. on the Federal Trade Commission's Regulation of Misleading Advertising*, 57 B.Univ.L.Rev. 833 (1977). *See also* Pitofsky, *Beyond Nader: Consumer Protection and the Regulation of Advertising*, 90 Harv.L.Rev. 661 (1977).

To determine the level of protection due the advertising material challenged in this case, the Court must undertake "the task of assessing the First Amendment interest at stake and weighing it against the public interest allegedly served by the regulation." *Bigelow v. Virginia*, 421 U.S. 809, 826, 95 S.Ct. 2222, 2235, 44 L.Ed.2d 600 (1975).

▌ The Government's interest in preventing the use of deceptive advertising is a legitimate and important one. As noted earlier, Reader's Digest is precluded from challenging the Government's belief that the simulated check and other items included in the administrative complaint are deceptive. Thus, the Court will assume that those items are deceptive and hence not entitled to First Amendment protection. Furthermore, it is well-settled that the FTC could frame its order broadly enough to prevent Reader's Digest from engaging in similarly deceptive practices in future sweepstakes promotions. *See FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 392, 79 S.Ct. 818, 3 L.Ed.2d 893 (1952); *National Commission on Egg Nutrition v. FTC*, 570 F.2d 157, 164 (C.A.7, 1977), *cert. denied*, —— U.S. ——, 99 S.Ct. 86, 58 L.Ed.2d 113 (1978); *Fedders Corp. v. FTC*, 529 F.2d 1398, 1401 (C.A.2, 1976).

The fact that a violation of section 5 of the Act has been established, however, does not permit the Government to ignore First Amendment interests. In *Beneficial Corp. v. FTC*,[27] the Third Circuit reviewed a cease and desist order issued by the FTC that forced Beneficial "to abandon entirely its copyrighted and heavily promoted phrase ['Instant Tax Refund']." 542 F.2d at 618. Although the court upheld the Commission's finding that previous "Instant Tax Refund" advertising campaigns were deceptive, it refused to enforce the order proscribing use of that term or any other words of similar meaning on the ground that the order went further than was necessary to eliminate the deception. *Id.* at 620. Reader's Digest relies heavily on *Beneficial Corp. v. FTC.* The Court agrees that *Beneficial* sets forth the standard to be used in judging the constitutionality of Paragraph II.C(3), but it does not dictate the result in this case. The Third Circuit considered the copyrighted phrase "Instant Tax Refund" to be a valuable business asset which, like a trade name, could not be ordered excised completely from advertising absent a finding that qualifying language could not eliminate its offensive features.[28] The Travel Check and Cash-Convertible Bond do not possess those qualities and, therefore, do not require the same high level of protection.[29]

▌ According to Reader's Digest, its First Amendment rights would be impermissibly infringed if the consent order were construed to go beyond proscribing the use of simulated items of value that can be shown to be confusing to consumers. However, the possibility that the consent order, if not limited, to provably deceptive advertising, might curtail some protected commercial speech does not necessarily mean that it is unconstitutional. On its belief that Reader's Digest had violated section 5 of the Act, the FTC was empowered to fashion appropriate restraints on Reader's Digest's future activities to avoid a recurrence of the violation. *Cf. National Society of Professional Engineers v. United States*, 435 U.S. 679, 697–98, 98 S.Ct. 1355, 55

---

**27.** 542 F.2d 611 (C.A.3, 1976), *cert. denied*, 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977).

**28.** *Beneficial Corp. v. FTC, supra*, 542 F.2d at 619–20. The court relied on *Jacob Siegel Co. v. FTC*, 327 U.S. 608, 66 S.Ct. 758, 90 L.Ed. 888 (1946), and *FTC v. Royal Milling Co.*, 288 U.S. 212, 53 S.Ct. 335, 77 L.Ed. 706 (1933), both of which described a statutory limitation on the Commission's authority, and held that the rule announced in the latter case had evolved into a general statement of constitutional principle. *Id.* at 620.

**29.** The *Beneficial* case also stressed the fact that any prior restraint on speech is suspect. 542 F.2d at 619–20. When "purely commercial speech" is involved, however, the Supreme Court has stated that the prohibition against prior restraints may be inapplicable. *Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc., supra*, 425 U.S. at 772 n. 24, 96 S.Ct. 1817; *Ohralik v. Ohio State Bar Ass'n, supra*, 436 U.S. at 455, 98 S.Ct. at 1918.

L.Ed.2d 637 (1978). To the extent it is necessary to achieve that objective effectively, the FTC may abridge Reader's Digest's First Amendment freedoms. *Cf. id.; see Warner-Lambert Co. v. FTC*, 562 F.2d 749, 763 n. 68 (C.A.D.C.1977), *cert. denied*, 435 U.S. 950, 98 S.Ct. 1575, 55 L.Ed.2d 800 (1978).

■■■ In the circumstances of this case, the Court holds that Paragraph II.C(3) passes constitutional muster without a requirement of proof of deception. Given the incontestable premise that the simulated check included in the administrative complaint is deceptive, the Government's presumption that all similarly simulated items of value probably will be deceptive is not unreasonable. A prophylactic rule aimed at preventing the harm alleged in the original complaint therefore seems appropriate. In addition, the effectiveness of the Government's efforts to prevent such deception would be substantially diminished if it were required to prove actual harm. *See Ohralik v. Ohio State Bar Association, supra*, 436 U.S. at 466, 98 S.Ct. at 1924. These governmental interests substantially outweigh the free speech interests abridged by Paragraph II.C(3). The commercial speech affected does not concern a matter of important public interest. More importantly, the Court perceives little likelihood of a chilling effect on Reader's Digest's efforts to market its products by way of promotional sweepstakes, because the regulation affects only the form of the message not its content. The ban on the use of "any confusingly simulated item of value" leaves open ample alternative channels for communicating sweepstakes numbers and related information to consumers. *Compare Linmark Associates, Inc. v. Township of Willingboro, supra*, 431 U.S. at 93–94, 97 S.Ct. 1614. "It is not difficult to choose statements, designs, and devices that will not deceive." *United States v. 95 Barrels of Vinegar*, 265 U.S. 438, 443, 44 S.Ct. 529, 531, 68 L.Ed.

1094 (1924), *quoted in Virginia State Board of Pharmacy v. Virginia Citizens Consumers Council, Inc.*, 425 U.S. at 772 n. 24, 96 S.Ct. 1817. In short, the "commonsense differences" between the speech regulated by the consent order and other varieties and the fact that Paragraph II.C(3) is essentially a manner restriction make "the absence of explicit proof or findings of harm or injury . . . immaterial." *Ohralik v. Ohio State Bar Association, supra*, 436 U.S. at 468, 98 S.Ct. at 1925.

■■■ The defendant's remaining constitutional arguments are without merit. For example, Reader's Digest correctly points out that the order must be "as specific as the circumstances will permit." *FTC v. Colgate-Palmolive Co.*, 380 U.S. 374, 393, 85 S.Ct. 1035, 1047, 13 L.Ed.2d 904 (1965); *National Commission on Egg Nutrition v. FTC*, 570 F.2d 157, 164 (C.A.7, 1977), *cert. denied*, —— U.S. ——, 99 S.Ct. 86, 58 L.Ed.2d 113 (1978). The Court finds that Paragraph II.C(3), when viewed in light of the administrative complaint, meets that standard. It is difficult to imagine how the order could have been drawn more narrowly without permitting Reader's Digest to evade its principal purpose. In the same vein, the Court is satisfied that the order gave Reader's Digest fair notice of what was proscribed. *See Grayned v. City of Rockford*, 408 U.S. 104, 109, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972). Thus, the Court rejects the argument that Paragraph II.C(3) is unconstitutionally vague.[30]

Having concluded that actual harm need not be shown to establish a violation of the consent order, the Court proceeds to consider whether either or both of the challenged items fall within the proscription of Paragraph II.C(3).

## II. THE TRAVEL CHECK

[30] The Government contends that the Travel Check distributed by Reader's Digest

---

30. It is unclear whether Reader's Digest is challenging the order on grounds of overbreadth as well. Such an argument would not be well-founded, because the doctrine of overbreadth "applies weakly, if at all, in the ordinary commercial context." *See Bates v. State Bar of Arizona, supra*, 433 U.S. at 380, 97 S.Ct. at 2707; *Ohralik v. Ohio State Bar Ass'n, supra*, 436 U.S. at 462, 98 S.Ct. at 1922 n. 20.

is a "simulated check" within the meaning of the order. It is for the Court to decide whether the order in fact has been violated; no special deference is due the judgment of the FTC on this issue. *See United States v. J. B. Williams Co., supra,* 498 F.2d at 429. In accordance with the terms of the consent agreement,[31] the Court will look to the administrative complaint for assistance in construing Paragraph II.C(3). Otherwise, the terms "simulated check" and "confusingly simulated item of value" will be given their ordinary meaning.

■ Webster's New World Dictionary (2d College ed. 1976) defines "simulate" as a verb meaning "1. to give a false indication or appearance of; pretend; feign . . . 2. to have or take on the external appearance of; look or act like." According to the The Random House College Dictionary (1973), "simulate" means "to assume or have the appearance or characteristics of; imitate." A traveler's check is a widely recognized type of check. Reader's Digest's "Travel Check," which appears as exhibit 1 in the appendix to this opinion, has the appearance of or imitates a real traveler's check or, at least, gives a false indication of being one; therefore, the Court concludes that it is a simulated check.

To violate the order as construed here, however, the Travel Check must be a "confusingly simulated check." In the present context, the word "confusingly" denotes that the challenged item must have a capacity to confuse or mislead consumers comparable to that of the "check" included in the administrative complaint. (A copy of the "check" appears as exhibit 3 in the appendix.) Several striking similarities between the Travel Check and the original check make the conclusion that the former is con-fusingly simulated almost inescapable. Both items are the approximate size of actual checks and have been printed on colored paper with traditional check-style borders in an obvious attempt to create an air of authenticity. The check states "Pay the sum of $100 DOLLARS A MONTH FOR LIFE" directly above the recipient's name, while the Travel Check provides that the same sum "will be paid to the order of:" the recipient. Both items contain legends in small type stating that they are "not negotiable" and instructing the recipient that he must return the entire sweepstakes package to be eligible to win. The Travel Check contains three sweepstakes numbers; the original check informs the recipient that he has been selected to receive six "Lucky Numbers."

Reader's Digest points to several differences between the original check and the Travel Check to support its argument that the latter is not prohibited.

For example, the original "check" contained a number in the upper right hand corner in the same way that a real check would be numbered. The "check" said: "Pay the sum of", followed by printed numerals and letters similar to the printing that would be used on a real check. Following that printing, the "check" contained a line where there appeared the handwritten amount as would appear on an actual check. It also included the phrase "non-transferable" and stated: "Valid only if returned before March 24." Finally, as with a real check, the "check" contained a signature line and a place for the date and was blank on the back side. Defendant's Opening Brief, Docket Item 37, p. 34. The Court finds these differences insignificant.[32] The FTC "is not limited to

---

**31.** Docket Item 1, ex. C, par. 6.

**32.** One flaw in the defendant's reasoning is its assumption that most members of the general public have a detailed knowledge of what an actual traveler's check looks like. The Court is unwilling to make that assumption.

With respect to the fact that the reverse sides of the Travel Check and the Cash-Convertible Bond contain advertising copy, the Court notes first that the faces of both items are complete in themselves. Moreover, the placement of the Travel Checks as the center page of a twelve-page sweepstakes pamphlet makes it unlikely that the consumer would notice the printing on their reverse sides. Finally, the printing on the back of the Cash-Convertible Bond does not detract from its appearance of authenticity, since many real bonds have print on their reverse sides.

prohibiting the illegal practice in the precise form in which it [was] found to have existed in the past." *FTC v. Ruberoid Co., supra,* 343 U.S. at 473, 72 S.Ct. at 803. The principal purpose of the consent order was to prevent the distribution of any confusingly simulated item of value, not just the items specifically mentioned in the administrative complaint. That purpose would be frustrated if Reader's Digest were able to avoid the order's proscription by using such slight changes in wording and minor variations in format. *See United States v. Vulcanized Rubber & Plastics Co.,* 288 F.2d 257, 259–60 (C.A.3, 1961), *aff'g* 178 F.Supp. 723 (E.D.Pa.1959); *In re Whitney & Co.,* 273 F.2d 211, 214 (C.A.9, 1959).

 Reader's Digest's allegation that it made the changes noted above in order to insure that the Travel Check could not be mistaken for an actual check is irrelevant. As the Supreme Court stated in *FTC v. Colgate-Palmolive Co., supra,* 380 U.S. at 393, 85 S.Ct. at 1047:

> If respondents in their subsequent commercials attempt to come as close to the line of misrepresentation as the Commission's order permits, they may without specifically intending to do so cross into the area proscribed by this order. However, it does not seem "unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line." *Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 340, 72 S.Ct. 329, 96 L.Ed. 367.

Finally, Reader's Digest argues that the Travel Check, which was part of a twelve-page sweepstakes pamphlet, does not have a tendency to deceive. To assess the tendency of the Travel Check to deceive, the Court must consider the advertising as a whole. *Beneficial Corp. v. FTC, supra,* 542 F.2d at 617. Reader's Digest distributed the Travel Check in a pamphlet labeled a "Sweepstakes Passport," which was designed to look like a United States passport.[33] Two of the Travel Checks were

printed on one side of a single sheet of paper and that page became the center page of the pamphlet. The Travel Checks are complete in themselves and would most likely be the first things to draw the attention of a consumer who quickly perused the pamphlet. Thus, the Court concludes that the tendency of the Travel Check to deceive consumers, at least initially, is not significantly affected by the information provided on the other pages of the pamphlet. In this respect, it is noteworthy that the Commission considered the check included in the administrative complaint deceptive and it too was part of a multi-page mailing.[34]

It is reasonable to presume that some people who would have discarded the pamphlet without even reading it, might have been induced to examine it more closely simply because they were confused as to whether the Travel Check was actually valuable. Still others, although probably a lesser number, may have believed the Travel Checks were valuable even after reading the pamphlet.

 In determining whether advertising has a tendency or capacity to deceive the Court must consider the audience to which it is directed. *See Bates v. State Bar of Arizona, supra,* 433 U.S. at 383 n. 37, 97 S.Ct. 2691. In this case, the audience is the general public, which has been defined to include:

> "the ignorant, and unthinking and the credulous, who, in making purchases, do not stop to analyze but too often are governed by appearances and general impressions"

*Beneficial Corp. v. FTC, supra,* 542 F.2d at 618 n. 11 (quoting 1 Callman, Unfair Competition and Trademarks § 19.2(a)(1) at 341–44 (1950)); *see Charles of the Ritz Distributors Corp. v. FTC,* 143 F.2d 676, 679 (C.A.2, 1944). In the circumstances of this case, where Reader's Digest has waived its right to contend that items like the check included in the original complaint are not confusingly simulated items of value, the

---

**33.** Docket Item 37, ex. A.

**34.** *See* Docket Item 1, ex. B, pp. 4–8.

Court concludes that the Travel Check has a sufficient capacity to deceive to be held in violation of the order. There is no basis for concluding that the Travel Check is likely to be significantly less deceptive than the original check.

## III. *THE CASH–CONVERTIBLE BOND*

The Government contends that the Cash-Convertible Bond is a "confusingly simulated item of value" within the meaning of Paragraph II.C(3). The Court agrees for many of the same reasons given in relation to the Travel Check. The Cash-Convertible Bonds, an example of which appears as exhibit 2 in the appendix, have many of the same characteristics as the original check, including: scroll-like borders, an official-looking background and a notation that they are non-negotiable. Also, the three bonds challenged in this action could be interpreted as giving the person in whose name they are registered $100 dollars a month for life, $2,000 a month for a year or $24,000, respectively.[35] In short, the Bonds were made to look like financial instruments.

Reader's Digest points out that there is no such thing as a "cash-convertible" bond. The Court, however, takes judicial notice of the generally known fact that "convertible bonds" are a common financial instrument. F.R.Evid. 201. Furthermore, the Court considers it unlikely that the majority of the general public, much less "the ignorant, and unthinking and the credulous," would appreciate the significance of the distinc-

tion between cash-convertible and convertible bonds.

The three Cash-Convertible Bonds were distributed in an envelope which contained three other certificates as well. After examining the Bonds in the context of the entire promotional packet, the Court concludes that they are likely to possess a tendency to deceive comparable to that of the original check; therefore, their use violated Paragraph II.C(3).

## CONCLUSION

Reader's Digest entered into a consent cease and desist order that prohibited it from distributing "simulated checks" or "confusingly simulated item[s] of value." Thereafter, it distributed a "Travel Check" and certain "Cash-Convertible Bonds" in connection with its sweepstakes promotions. The Government contends these items violated the consent order and now seeks assessment of a civil penalty. Contrary to Reader's Digest's position, the Court neither construes the order as requiring proof that the challenged items actually confused consumers nor concludes that the First Amendment mandates such a construction. Finally, because the distribution of both the Travel Check and the Cash-Convertible Bond violated the order, the Government is entitled to partial summary judgment on the issue of liability.[36]

An order will be entered in accordance with this opinion.

---

35. Docket Item 1, ex. E, pp. 11, 13 and 15.

36. Of course, Reader's Digest may still press its arguments of good faith, laches, estoppel and

lack of harm to the public in connection with the penalty phase of this litigation.

APPENDIX

## "TRAVEL CHECK"
### ≫ 100 DOLLARS A MONTH FOR LIFE ≪

WILL BE
PAID TO THE
ORDER OF:

YOUR
SWEEPSTAKES
NUMBERS

This "Travel Check" is not negotiable, but if you return this entire "Sweepstakes PASSPORT" by August 3, 1973, and if any one of your six numbers should be the Grand Prize winner ... you will receive the sum above each month for the rest of your life.

$150,000.00 SWEEPSTAKES

M1018-5

EXHIBIT 1

"CASH-CONVERTIBLE BOND"

★ G 789884 THIS IS YOUR SIXTH
SWEEPSTAKES NUMBER ★

$2,000.00 A MONTH
FOR A YEAR

Registered in the name of:

_____

72447

Notice: To have six chances to win any of 5,796 Sweepstakes prizes, including $2,000.00 A MONTH FOR A YEAR, return all six of your "Bonds" in the enclosed envelope by December 9, 1974.

This "Bond" is registered exclusively in your name . . . and—if any one of your six Sweepstakes Numbers enclosed is the Grand Prize winner in this Sweepstakes—it is convertible to cash in the amount of $2,000.00 a month for a year (or $100.00 a month for life or $24,000.00 cash, if you prefer).

LO-4-2

Carolyn Davis

NON-NEGOTIABLE

READER'S DIGEST $125,000.00 CHRISTMAS HOLIDAY SWEEPSTAKES

$2,000 A MONTH FOR A YEAR

EXHIBIT 2

1058

AWN-869

NON-TRANSFERABLE.

## 🦅 READER'S DIGEST $250,000.00 SWEEPSTAKES

If you are an Early Bird Prize winner—Reader's Digest guarantees to deposit each month in your personal account the below-mentioned sum at your local___ bank (or any other bank you may designate).

NO ____

Pay the sum of

$100.00 DOLLARS A MONTH FOR LIFE $100 00/100

You have been selected to receive

Lucky Numbers.
See next page.

2□ 3□ 4□ 5□ 6☒ 7□

This check is not negotiable. But if you return it by March 24, 1969, and one of your Lucky Numbers is the early bird prize winner…you will receive the sum above each month for the rest of your life. Mail back this entire Sweepstakes Book today. SEND NO MONEY.

_Carolyn Davis_ ON THIS DATE

**VALID ONLY IF RETURNED BEFORE**

EXHIBIT 3