**UNITED STATES of America, Plaintiff,**

v.

**The READER'S DIGEST ASSOCIATION, INC., Defendant.**

Civ. A. No. 75–184.

United States District Court,
D. Delaware.

July 2, 1980.

James W. Garvin, Jr., U. S. Atty., Wilmington, Del., and Benjamin P. Schoen, Atty., Dept. of Justice, William Sanger and Terrence J. Boyle, Attys., Federal Trade Commission, Washington, D. C., of counsel, for plaintiff.

R. Franklin Balotti, Donald Bussard and Richard D. Kirk of Richards, Layton & Finger, Wilmington, Del., and John B. Kuhns of Williams & Connolly, Washington, D. C., of counsel, for defendant.

## MEMORANDUM OPINION

LATCHUM, Chief Judge.

This action was brought on July 7, 1975, by the United States of America (the "Government") against Reader's Digest Association, Inc. ("Reader's Digest" or "defendant"), seeking injunctive relief and the recovery of civil penalties pursuant to sections 5($l$) and 16(a)(1) of the Federal Trade Commission Act (the "Act"), 15 U.S.C. §§ 45($l$) and 56(a)(1), for alleged violations of a consent order which became final on January 15, 1972.[1] The consent order required Reader's Digest, which regularly uses a promotional device known as a

---

1. Docket Item ("D.I.") 1.

"sweepstake" in its business of selling and distributing magazines, books and other products, to cease and desist from engaging in various practices in connection with any sweepstake or comparable promotional device. Among the practices proscribed was: "Using or distributing simulated checks, currency, 'new car certificates', or using or distributing any confusingly simulated item of value."[2] The complaint alleged that in 1973 Reader's Digest, in violation of the consent order, mailed to consumers 13,898,-521 "Travel Checks"[3] and thereafter mailed to consumers 4,042,000 "Cash-Convertible Bonds" in connection with their promotional sales efforts.

In prior proceedings in this case, the Court granted the Government's motion for partial summary judgment on the liability issue, holding that the distribution by Reader's Digest of the Travel Checks and Cash-Convertible Bonds violated the consent order.[4] *United States v. Reader's Digest Association, Inc.*, 464 F.Supp. 1037, 1055 (D.Del.1978).

Following additional discovery, the Government on October 26, 1979, requested the Court to impose civil penalties in an amount not less than $1,750,000.[5] On May 13, 1980, the Court held an evidentiary hearing on the civil penalty aspects of this case. Now after considering the sufficiency and weight of the testimony,[6] the demeanor of the witnesses, the documentary evidence produced,[7] and the pre-hearing and post-hearing briefs of the parties,[8] the Court

makes the following findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

▪ In determining the size of civil penalties, the Court must consider a number of factors including: (1) the good or bad faith of the defendant; (2) the injury to the public; (3) the defendant's ability to pay; (4) the desire to eliminate the benefits derived by a violation; and (5) the necessity of vindicating the authority of the Federal Trade Commission ("FTC"). *United States v. Papercraft Corp.*, 540 F.2d 131, 141 (C.A.3, 1976); *United States v. J. B. Williams Company, Inc.*, 498 F.2d 414, 438 (C.A.2, 1974); *Federal Trade Commission v. Consolidated Foods Corp.*, 396 F.Supp. 1353, 1356–57 (S.D.N.Y.1975); *United States v. Swingline*, 371 F.Supp. 37, 46 (E.D.N.Y. 1974).

First, Reader's Digest contends that the Government seeks a penalty which exceeds the maximum penalty allowed by statute. This contention is based on the following two arguments: (1) since there were only six mass promotional mailings of Travel Checks and Cash Convertible Bonds in 1973 and 1974,[9] there were only six violations of the consent order and (2) because five of the six mass mailings occurred at a time when the relevant statute provided for a $5,000 penalty per violation and only one mass mailing occurred when the amended statute provided for a $10,000 penalty per

2. D.I. 1, ex. A., par. II.C(3).

3. D.I. 1; Defendant's answers to interrogatories revealed that a total of 13,898,521 Travel Checks were mailed over the period of the following dates: February 26 through March 2, 1973, March 23, April 20 and June 30, 1973; and that a total of 4,042,000 Cash-Convertible Bonds were mailed through two separate mailings on November 1973 and October 1974. D.I. 9, no. 3(b).

4. *See*, D.I. 44 & 45.

5. D.I. 62.

6. D.I. 81.

7. The parties stipulated that in addition to the testimony and exhibits adduced at the evidentiary hearing, other information before the Court in the form of answers to interrogatories, depositions and affidavits could also be considered for determining what penalty, if any, is to be assessed. D.I. 81 (Trial Transcript "T." pp. 5–6).

8. D.I. 62, 64, 66, 68, 82 & 83.

9. Four mass mailings of the Travel Checks were made in the last week of February 1973, March 23, April 20 and June 30, 1973. Two mass mailings of the Cash Convertible Bonds were made on November 11, 1973, and in October 1974. D.I. 9, Ans. to Int. 3(b).

violation,[10] the maximum penalty allowable in this case is $35,000.

The Government, on the other hand, contends that each individual mailing of a Travel Check or Cash Convertible Bond to an addressee constituted a separate violation of the consent order and therefore Reader's Digest, having distributed a total of 17,940,521 such items, is guilty of 17,940,521 separate violations of the order. Thus, according to the Government the allowable maximum penalty should be determined by multiplying the number of separate violations by $5000 or $10,000 whichever amount was applicable at the time of the distributions.[11]

A determination of the proper number of violations depends upon the interplay of the penalty provisions of the applicable statute and the language of the consent order.

The statute, 15 U.S.C. § 45(*l*), applicable to violations which occurred prior to November 16, 1973, provided: [12]

(1) Any person, partnership, or corporation who violates an order of the Commission to cease and desist after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $5,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the United States. Each separate violation of such an order shall be a separate offense, except that in the case of a violation through continuing failure or neglect to obey a final order of the Commission each day of continuance of such failure or neglect shall be deemed a separate offense.

The consent order reads in pertinent part as follows:

\*  \*  \*  \*  \*  \*

IT IS ORDERED that Reader's Digest Association, Inc., a corporation, and its officers, agents, representatives and employees, directly or through any corporate or other device, in connection with the publication, advertising, offering for sale, sale, or distribution of magazines, books, or other products in commerce as "commerce" is defined in the Federal Trade Commission Act, cease and desist from:

\*  \*  \*  \*  \*  \*

C. (3) Using or distributing simulated checks, currency, "new car certificates;" or using or distributing any confusingly simulated item of value.

■ It is quite clear that the Act provides that *each violation* of a cease and desist order is a *separate offense*. The language of the consent order is equally clear in prohibiting Reader's Digest from "distributing *any* confusingly simulated *item* of value." (Emphasis added). Thus, if Reader's Digest had distributed only a single Travel Check or Cash Convertible Bond in its promotional material, there plainly

---

10. The maximum penalty for a single violation of a cease and desist order was $5,000 prior to November 16, 1973. 52 Stat. 111. After November 16, 1973, however, the maximum penalty provided for a single violation was increased to $10,000. 87 Stat. 591.

11. The record does not indicate the number of Cash Convertible Bonds that were mailed in November 1974, when the maximum allowable penalty was $10,000 rather than $5,000 per violation; however, if a $5,000 penalty were assessed for each of the 17,940,521 separate items that were mailed the total penalty would amount to more than 89 billion dollars.

12. 15 U.S.C. § 45(*l*) as amended on November 16, 1973 applicable to violations which occurred thereafter provides:

(*l*) Any person, partnership, or corporation who violates an order of the Commission after it has become final, and while such order is in effect, shall forfeit and pay to the United States a civil penalty of not more than $10,000 for each violation, which shall accrue to the United States and may be recovered in a civil action brought by the Attorney General of the United States. Each separate violation of such an order shall be a separate offense, except that in the case of a violation through continuing failure to obey or neglect to obey a final order of the Commission, each day of continuance of such failure or neglect shall be deemed a separate offense. In such actions, the United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of such final orders of the Commission.

would have been a violation of the precise language of the order. The fact that Reader's Digest distributed millions of the proscribed items rather than just one does not lessen or reduce the seriousness of each individual violative distribution. Hence, the Court concludes that each individual distribution of a Travel Check or Cash Convertible Bond constituted a distinct and separate violation of the order, and since the evidence shows that 17,940,521 of the proscribed items were distributed by mail, there were that many separate violations.

This conclusion, based on the unequivocal language of the statute and consent order, also finds support in prior court decisions. In *United States v. Wilson Chemical Co., Inc.*, 1962 CCH Trade Cases ¶ 70,478 (W.D. Pa.1962), *aff'd*, 319 F.2d 133 (C.A.3, 1963), the district court found that defendants' violative advertisements appeared in approximately 25 million comic books. However, the Government grouped the violations into nine categories depending upon the publisher and the month of publication and sought civil penalties based only on that basis. The court imposed the maximum penalty upon each of the nine categories of violations but noted in dicta "that each publication in each comic book, as shown by the evidence, is a separate and distinct violation."

Likewise, the court in *United States v. Golden Fifty Pharmaceutical Co., Inc.*, 421 F.Supp. 1199 (N.D.Ill.1976), spoke directly to the number of violations that could be charged in the case of mass mailings. In that action, the Government, having charged the defendants with fourteen mass mailings of the proscribed material in Count I and with two individual mailings in Count III, maintained that the defendants were liable for sixteen violations. The court agreed stating at 421 F.Supp. at 1207:

> Earlier cases offer little concrete guidance on the appropriate number of violations to be charged when an advertisement is disseminated through a mass mailing. Generally, the courts have accepted the FTC's breakdown with little comment. *E. g., J. B. Williams, supra,*

498 F.2d at 420–421; *United States v. Ancorp National Services, Inc.*, 367 F.Supp. 1221 (S.D.N.Y.1973); *aff'd*, 516 F.2d 198 (2d Cir. 1975). A plausible explanation for the dearth of authority is that the FTC's estimates have been reasonable, if not conservative. For example, in *United States v. Wilson Chemical Co., Inc.*, 1962 CCH Trade Cases ¶ 70,478 (W.D.Pa.1962), *aff'd*, 319 F.2d 133 (3d Cir. 1963) (mem.), the court found that defendants' advertisement appeared in approximately 25,000,000 comic books. The Government, however, grouped the violations into nine categories depending upon the publisher and the month of publication. The court imposed the maximum penalty upon each of the nine violations, noting in dicta that each individual comic book which reached a customer could be considered a separate violation.

Without straining, we could read the statute and order here to similar effect. The statute provides that *each violation* of a cease and desist order is a separate offense. The order prohibits defendants from mailing or causing to be mailed *any advertisement* which contains a proscribed representation. If defendants had mailed a single advertisement in Count I, we would have little trouble finding a violation. The fact that they mailed millions rather than one or two, as in Count III, does not diminish the seriousness of each individual violation. The Government's charitable grouping of the violations in Count I by date and mailing service is more than reasonable.

Accordingly, we find that the proper number of violations attributable to the conduct charged in Count I is fourteen. Moreover, each of the two individual violations alleged in Count III is properly chargeable as a separate violation of the cease and desist order.

Thus, while it is true that in any given case the Government may choose to limit the number of violations for which penalties are sought, it is clearly not required to do so by either the applicable statute or any regulation. In the present case, therefore, there is nothing which prevents the Government

from seeking to impose a penalty for each separate violation or which prevents this Court from imposing a separate penalty for each individual distribution of the proscribed items.

■ Reader's Digest's second contention is that the penalty proposed by the Government is excessive because Reader's Digest acted in the utmost good faith when it distributed the offending material. For example, Reader's Digest contends that once it determined that the FTC believed the Travel Check promotion to be violative of the order, it voluntarily ceased to distribute the simulated checks. The evidence, however, indicates the opposite. When Reader's Digest was advised by letters on April 13, 1973,[13] and again on April 25, 1973,[14] that the FTC was of the opinion that the Travel Checks then being distributed violated Part II C.(3) of the cease and desist order, Reader's Digest did not stop distributing that item. Instead it responded in letters [15] dated April 19, May 1 and May 7, 1973, and in a conference [16] with the FTC's attorneys on May 2, 1973, by endlessly arguing that the promotional Travel Check did not violate the consent order. In the May 7, 1973 letter, however, Reader's Digest did state that it would not distribute any more such checks after June 30, 1973, when the then current promotional program would cease.[17] Thus, Reader's Digest failed and refused to discontinue the distribution of Travel Checks until after it had mailed more than thirteen million checks and had completed its then scheduled current distribution program, even though more than two months before it had been advised of the FTC's opinion that the Travel Checks violated the consent order.[18] It seems clear, therefore, that the FTC's letters stating that the Travel Checks were "violative of the order" were never taken seriously by Reader's Digest.[19] That type of conduct and attitude does not reflect a good faith effort to comply with the order.

■ Reader's Digest contends, however, that its attitude and conduct were reasonable in view of the fact that the consent order was ambiguous and confusing. The Court is unable to accept that argument for several reasons.

In the first place, the evidence shows that the exact language of the consent order involved in this action was language that was suggested by Reader's Digest. The pertinent language of the consent order originally proposed by FTC read as follows:

Using or distributing simulated checks, currency or other negotiable instruments; and using or distributing simulated new car certificates or any other items of value.

However, during the consent order negotiations which followed, the above prohibitive language was revised at Reader's Digest's suggestion to read precisely as now contained in Part II C.(3) of the consent order which is involved in this case.[20] Thus, Reader's Digest's claim that it was confused as to the scope of the order therefore must not be taken at face value.

Reader's Digest's contention that the consent order was ambiguous and confusing is also highly suspect for another reason. The evidence shows that shortly after the consent order was executed on July 1, 1971,[21] one of Reader's Digest's in-house counsel,[22] who had formerly been an attorney with the FTC, prepared "a memorandum in laymen's terms" as a guide to the intricacies of the consent order for use by product mana-

---

13. PX 1; D.I. 81, T.39.

14. PX 2; D.I. 81, T.40–41.

15. DX 2, 3 & 4.

16. D.I. 81, T.24, 25–26, 42, 44.

17. DX 4, p. 6; DX 81, T.32, 49.

18. Reader's Digest distributed 4,780,000 Travel Checks, more than a third of the entire Travel Checks promotion, between the time it received

the FTC's April 13, 1973 letter and June 30, 1973. D.I. 81, T.49–51.

19. D.I. 81, T.51.

20. D.I. 38, Ex. B, pp. 1–2.

21. D.I. 1, Ex. C.

22. D.I. 81, T.10–11.

gers, copywriters and new employees of Reader's Digest.[23] That memorandum at page 7 stated:

(4) RDA may not use "simulated checks, currency, new car certificates"; or distribute any confusingly simulated items of value. This FTC Order appears to be an absolute ban on the use of *checks in any form.* It also calls for careful scrutiny of *any "bonds", "traveler's checks",* or other copies of negotiable instruments.

DX 1, p. 7 (emphasis added). Thus, it is clear that as early as 1971 Reader's Digest's counsel was aware and so advised other employees that the use of promotional sweepstake items, referred to as checks, travel checks and bonds, appeared to be absolutely banned or at least presumptively barred under the terms of the consent order.

Finally, even if the Court were willing to assume that Reader's Digest was confused as to the scope of the order, it would still conclude that Reader's Digest had not acted in good faith because the company made no attempt to obtain a prior opinion from the FTC as to whether its use of the Travel Check would violate the order.[24] This failure is significant because Reader's Digest clearly could have obtained such an opinion from the FTC pursuant to a provision in the FTC's Rules of Practice. That provision provides, in pertinent part, that:

[a]ny respondent subject to a Commission order may request advice from the Commission as to whether a proposed course of action, if pursued by it, will constitute compliance with such order.[25]

The Supreme Court has read that provision as *obligating* the FTC "to give . . . definitive advice* as to whether [a] proposed action, if pursued, would constitute compliance with the order." *FTC v. Colgate-Palmolive Co.,* 380 U.S. 374, 394, 85 S.Ct. 1035,

1048, 13 L.Ed.2d 904 (1965) (emphasis added). Since Reader's Digest failed to utilize this available administrative process it is hardly in a position to justify its behavior by pointing to the ambiguous nature of the order.

■ Reader's Digest also advances the argument that "it made a good faith determination that the 'Travel Check' and 'Cash Convertible Bond' were not likely to confuse or deceive consumers"[26] and that it "made a good faith determination that the [order] only prohibited dissemination of promotional items which would be likely to deceive consumers . . . ."[27]

■ This, however, is an improper standard for monitoring compliance with an FTC order. To determine whether a promotional item violates an FTC order, the correct standard is not whether the promotional items are deceptive, but rather whether their use conflicts with the terms and spirit of the order. The language of Part II C.(3) of the consent order does not prohibit mailing deceptive promotional materials, it proscribes the distribution of certain *types* of items which the FTC has already determined were deceptive. Part II C.(3) does not use the word "deceptive"; rather, it uses the term "confusingly simulated item of value." Thus, Reader's Digest should have evaluated whether the Travel Check or Cash Convertible Bond were each a "confusingly simulated item of value."

The "deceptive" standard may be properly used by an entity only when no order on the subject is outstanding. By entering into the consent judgment in question, Reader's Digest's appropriate compliance standard became: do these promotional items violate the terms or fall within the scope of the consent order? If they appeared to come within the terms of the order, it was obliged not to distribute them, even if it believed them not to be deceptive.

---

**23.** Id., T.13; DX 1.

**24.** D.I. 81, T.51–52.

**25.** The quoted provision has been included in the FTC's Rules of Practice since at least 1964. *See* 16 C.F.R. § 3.26(b) (1964 Supp.).

**26.** D.I. 64, p. 26.

**27.** *Id.,* pp. 28–29.

Thus, good faith in the context of this proceeding is to be determined not by whether Reader's Digest believed that the Travel Check and Cash Convertible Bond were not deceptive, but rather by whether Reader's Digest attempted honestly to comply with the terms of the consent order.

There is additional evidence which has relevance to Reader's Digest's lack of good faith compliance with the consent order. In October 1979, Miss Megan R. Golden received a promotional package from Reader's Digest,[28] some eleven months after this Court filed its opinion on the liability issue in this action. Through the window of the envelope in which the promotional material was enclosed, one could view the typed addressee's name and address. Just below the address to the left side appeared the printed words: "Grand Prize Winner, Pay To The Order Of" and below that was the typed name Megan R. Golden. On the right side of the window, one can see the printed words "Amount of Check" and below that the typed figure "$50,000.00." Thus, despite the decision of this Court in November 1978, Reader's Digest appears to be continuing to distribute confusingly simulated items of value. This behavior along with its past conduct negates any claim of good faith compliance with the consent order.

■ This Court also finds that the contention of Reader's Digest that the Government acquiesced in its violative conduct is wholly without merit. As previously noted, the FTC's staff advised Reader's Digest that distribution of the Travel Check was considered to be a violation of the consent order, yet Reader's Digest continued with its then current promotion through June 30, 1973. With respect to the Cash Convertible Bond promotion, Reader's Digest states that the first time the FTC complained about this item was when this suit was commenced in 1975. However, Reader's Digest never submitted the Cash Convertible Bond to the FTC for review and insofar as the record in this case is concerned, it appears that the FTC had no independent way of knowing about that promotion when it was conducted. Finally, the delay between the dates when the violations occurred and the filing of this suit creates no inference that the FTC approved such activities.

■ Turning now to a consideration of the public injury factor, Reader's Digest argues there is not a scintilla of evidence to suggest that a single person was confused or deceived by either the Travel Check or Cash Convertible Bond.[29] Indeed, Reader's Digest points out that the Government does not contend that *any* "particular person or persons" was "deceived or confused" either by the Travel Check, the Cash Convertible Bond or by the entire promotional mailings of which these items were a part.[30] Again Reader's Digest misses the point in replaying this argument as it did in the liability part of this action. As the Court pointed out in its earlier opinion, the FTC issued an administrative complaint "reflecting its belief that certain practices were deceptive or confusing" and then entered into a consent order which required Reader's Digest to cease and desist from employing those or similar practices. 464 F.Supp. 1046–47. This Court later concluded:

> By entering into the consent order, [Reader's Digest] relinquished its right to contend that the items mentioned in the original complaint were not deceptive and in violation of section 5 of the Act.

464 F.Supp. at 1049. This Court further found that the Travel Check and the Cash Convertible Bond had "a sufficient capacity to deceive to be held in violation of the order." 464 F.Supp. at 1055. Thus, based on this Court's earlier opinion as the law of the case, Reader's Digest may not now contend that the promotional items in question did not have the capacity to confuse and deceive the public.

The principal purpose of a cease and desist order is to prevent material having a capacity to confuse and deceive from reach-

---

**28.** PX 3; D.I. 81, T.3–4; T.55–59, 66.

**29.** D.I. 64, p. 32.

**30.** D.I. 18, Ans. to Int. nos. 10 & 15 at pp. 18, 20–21.

ing the public. 464 F.Supp. at 1046. Thus, whenever such promotional items reach the public, that *in and of itself* causes harm and injury. The Government need not adduce proof of specific injuries in a penalty assessment proceeding because "[i]t is reasonable to presume that some people who would have discarded the pamphlet without even reading it, might have been induced to examine it more closely simply because they were confused as to whether the Travel Check was actually valuable. Still others, although probably a lesser number, may have believed the Travel Checks were valuable even after reading the pamphlet." 464 F.Supp. at 1054.

Reader's Digest presented testimony by a Vice President of Reader's Digest [31] and an expert witness [32] aimed at proving the proposition that the percentage of individuals who received the promotional material containing the Travel Check and Cash Convertible Bond and who ordered magazine subscriptions was no greater than the percentage of individuals ordering subscriptions from other sweepstakes promotional material which did not contain the two violative items. Hence, Reader's Digest would have the Court draw the conclusion that the Travel Check and Cash Convertible Bond had no impact whatever on Reader's Digest revenues and that it did not obtain unusual benefits from the distribution of these two items. The Court gives little credence or weight to this testimony for the purposes for which it was introduced. First, the Court finds the charts [33] introduced comparing the results of the violative promotions with the non-violative promotions are entitled to very little weight and the same is true with respect to the evidence adduced by the expert witness who based his testimony on those charts.[34] This is so because the testimony clearly showed that the results of a particular promotion is affected by various factors, such as the time of the year of the promotion,[35] the literacy of the recipients,[36] the prizes or gifts offered,[37] the subscription price of the magazine,[38] and numerous other criteria.[39] The evidence also indicated that the charts did not reflect any analysis of the mailing lists used in the promotions compared and that the mailing lists used to distribute the promotions varied with each promotion.[40] This testimony clearly indicated that the positive responses received in the compared promotions could vary considerably because of different factors which applied to each promotion other than just the type of promotion. Thus, the chart and the expert testimony which relied upon the chart do not lead to the conclusion suggested by Reader's Digest that the violative promotions had no impact whatever upon Reader's Digest revenues.

◼ Nevertheless, despite the built-in distortions of the comparisons shown on the chart, the evidence did reveal that the Travel Check promotions were among the top three of those compared in receiving positive subscription responses.[41] Reader's Digest's expert stated that the Travel Check promotions were not the best nor worst but held about middle ground in receipt of positive responses.[42] Accepting the conclusion that Reader's Digest did not obtain any *unusual* benefits from the distribution of these items is entirely beside the point. The evidence indicates that it received substantial benefits from the violative distributions. For example, it appears that the gross subscription revenue received

---

**31.** D.I. 81, T.69–129.

**32.** *Id.*, T.129–155.

**33.** DX 7 & 7A.

**34.** D.I. 81, T.129–155, 135; DX 8.

**35.** D.I. 81, T.103, 104.

**36.** *Id.*, T.101, 104.

**37.** *Id.*, T.101, 103 & 104.

**38.** *Id.*, T.103.

**39.** *Id.*, T.103–104, 135.

**40.** *Id.*, T.106–107.

**41.** D.I. 81, T.106.

**42.** *Id.*, T.146; similar comparative figures were not available for the Cash Convertible Bonds. *Id.*, T.145.

by Reader's Digest on the Travel Check promotion was greater than 2.7 million dollars [43] and that the gross subscription revenue received on the Cash Convertible Bond promotion probably exceeded 2.5 million dollars.[44] Thus, the Court concludes that Reader's Digest's violative promotions resulted in a substantial benefit to Reader's Digest.

Turning now to Reader's Digest's ability to pay any civil penalty assessed, the Court finds that Reader's Digest's total assets as of December 31, 1978, amounted to more than $325,000,000, that its retained earnings exceeded $70,000,000, that its after tax mean net profits for the calendar years 1976, 1977 and 1978 exceeded $37,000,000, and that its mean gross revenues from all sources for the calendar years 1976, 1977 and 1978 exceeded $475,000,000.[45] There seems little doubt that Reader's Digest is able to pay a substantial civil penalty. After all, Reader's Digest was quite willing to put more than $1.4 million at risk on postage [46] alone to distribute the violative material. It is unlikely that amount would have been expended as a matter of business judgment had not a benefit been expected and received.

Finally, the Court finds that a civil penalty of $1,750,000, the minimum suggested by the Government, is entirely reasonable under all the circumstances of this case. While this amount may seem large, it amounts to no more than 10 cents per violation and only 2 cents more than Reader's Digest expended for postage in the violative mailings. While this penalty is not insignificant, it is no more than a moderate one when compared to Reader's Digest's financial resources. A civil penalty should be more than a mere "license fee" or "an acceptable cost of violation" of an order and should provide a "meaningful deterrence."

*United States v. ITT Continental Baking Co.,* 420 U.S. 223, 232–33, 95 S.Ct. 926, 932, 43 L.Ed.2d 148 (1975). The civil penalty here imposed measured against all the reasonable criteria considered should act as a deterrent without being overly punitive and is necessary under the circumstances above described in order to vindicate the authority of the FTC. *FTC v. Consolidated Foods Corp., supra* at 1357.

In addition to civil penalties, the Government has requested an injunction against future violations of the consent order. Section 5(*l*) of the Act, 15 U.S.C. § 45(*l*), provides:

> The United States district courts are empowered to grant mandatory injunctions and such other and further equitable relief as they deem appropriate in the enforcement of [a] final orde[r] of the Commission.

The Court will grant the injunctive relief requested because it is convinced that this additional remedy should be afforded the Government in order to further assure that Reader's Digest will abide by the provisions of the order to which it agreed in 1971.

Plaintiff is directed to file a proposed final judgment and decree consistent with this memorandum opinion within fifteen (15) days from this date.

---

43. DX 7.

44. DX 7A; because the record does not make a breakdown of the magazines subscribed to at different subscription prices, an exact figure cannot be determined.

45. D.I. 59.

46. D.I. 51, Objection/Answer to Int. no. 7; the record does not reveal the other costs of such promotion.