**UNITED STATES of America**

v.

**Ernest BARKMAN.**

**Civ. A. No. 90–7313.**

United States District Court, E.D. Pennsylvania.

Jan. 28, 1992.

the state of mind required.

Douglas J. Smillie, Gretchen W. Anderson, Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for plaintiff.

Michael M. Baylson, U.S. Atty., Debra L.W. Cohn, Asst. U.S. Atty. Dept. of Justice, E.D.Pa., Philadelphia, Pa., for defendant.

## OPINION

CAHN, District Judge.

Before the court is a complaint by the United States of America ("USA") seeking injunctive relief and civil penalties against Ernest Barkman. The USA, acting on behalf of the Environmental Protection Agency ("EPA"), alleges that Barkman unreasonably failed to comply with Information Requests issued to him pursuant to Section 104(e) of the Comprehensive Environmental

Response, Compensation and Liability Act (CERCLA), 42 U.S.C. § 9604(e).

Following the filing of the complaint, Barkman substantially complied with the Information Requests thus mooting the claim for injunctive relief. What remains to be decided is whether the USA is entitled to a civil penalty for unreasonable delay and, if so, in what amount.

I make the following:

## FINDINGS OF FACT

1. Ernest Barkman ("Barkman") resides in Chester County at Route 10 and Welsh Road in Honey Brook, Pennsylvania. Barkman has resided in Honey Brook, Pennsylvania, for thirty years with his wife and children.

2. Barkman is illiterate.

3. Barkman owns and operates the Welsh Landfill Superfund Site ("Site"), a/k/a "Barkman Landfill", a/k/a "Honey Brook Landfill".

4. On the site are several trash collection and disposal businesses, all owned and/or operated by the defendant, including: EB Auto Wrecking, a junkyard owned and operated by the defendant; Twin County Disposal Company, a refuse collection company owned and operated by Ern–Bark, Inc., a company solely owned and operated by the defendant; and Main Line Carting, a refuse collection company owned by Ernest Barkman, Jr., defendant's son, and operated by the defendant and his son.

5. The site is in the same vicinity as several other potential locations of hazardous substances. These include another existing landfill and a quarry which had been used for dumping.

6. From 1963 until approximately 1976, Barkman's Trash Disposal Company, a/k/a Barkman Disposal, a company also owned and/or controlled by the defendant, deposited municipal and industrial waste on the Site.

7. The Pennsylvania Department of Environmental Resources ("PADER") has monitored activities on the Site since 1972.

8. In the early 1980's, PADER and the EPA sampled residential wells on and near the Site and found elevated levels of benzene, 1, 2 dichloroethane, 1,1, dichloroethane, tetrachloroethylene, and vinyl chloride which are "hazardous wastes" within the meaning of Sections 1004(5) and 3001 of RCRA, 42 U.S.C. § 6903(5) and 40 C.F.R. § 261.31 and "hazardous substances" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

9. Because PADER found hazardous substances in residential wells on and near the Site in 1984, PADER has provided bottled water to approximately 44 homes near the Site.

10. Because of a release of hazardous substances into the groundwater, EPA listed the Site on the National Priorities List ("NPL") in 1984.

11. In 1984, EPA and PADER performed a preliminary assessment in accordance with the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. Part 300.

12. In 1984, Barkman stored twenty-six 55–gallon drums of liquid wastes on a flatbed trailer on the Site. The drums contained chlorobenzene, toluene, methylene chloride, ethylbenzene, and 1,1–dichloropropane, which are "hazardous wastes" within the meaning of Sections 1004(5) and 3001 of RCRA, 42 U.S.C. § 6903(5) and 40 C.F.R. § 261.31 and "hazardous substances" as defined by Section 101(14) of CERCLA, 42 U.S.C. § 9601(14).

13. The hazardous substances found on defendant's property on the Site are harmful to human beings: they irritate the skin, eyes, and nose, cause dermatitis and affect the nervous system. Several of the substances are carcinogenic.

14. On February 22, 1985, EPA issued an administrative order to Mr. Barkman summarizing its findings of hazardous substances on and around the Site. The Order directed the defendant to dispose of and clean up the drums and sample the residential wells and the ground water on the Site. Barkman partially complied with this order.

15. In October of 1983, Barkman sold his trash hauling business to SCA Services (SCA). This transaction involved the sale of Barkman's trash collection routes and a five year lease of the front portion of the site, including the garage. The agreement also prohibited Barkman from competing with SCA in the trash hauling business.

16. In connection with the sale to SCA, Barkman transferred all records and past due accounts to SCA.

17. Thereafter, Barkman did not have any documents in his possession relating to the sale to SCA. Rather, documents relating to the sale to SCA were in the possession of Barkman's counsel.

18. In approximately 1986, Barkman bought back some of the Chester County trash collection routes from SCA. However, Barkman did not get back any of the records of the operation of the business when he reacquired the Chester County trash routes in 1986.

19. Barkman's current customers are not identical to his previous customers.

20. On May 31, 1989, EPA sent a letter to Ernest Barkman notifying him that he was potentially liable for contamination at the Site.

21. The May 31, 1989, letter also included an Information Request, pursuant to Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), properly authorized by Stephen R. Wassersug, Director, Hazardous Waste Management Division, EPA Region III.

22. The May 31st Information Request contained numerous questions relating to the following four subject matters:

1. the nature and quantity of hazardous substances generated, handled, stored and/or disposed of at the Site;
2. the names of individuals who might have additional information or documents about any hazardous substances at the Site, including employees and customers;
3. the identity of any additional responsible parties;
4. the liability insurance coverage available to pay for any necessary cleanup.

It also contained two catch-all questions requesting any residual information and documents which might pertain to the Site in the defendant's or anyone else's possession, custody or control.

23. Mr. Barkman received the May 31, 1989, Information Request in early June of 1989, and reviewed it with his attorneys within a week of its receipt.

24. EPA granted defendant's request for an extension so that the response to the May 31, 1989, Information Request was due on July 4, 1989.

25. As of July 4, 1989, when the response to the May 31, 1989, Information Request was due, defendant had not submitted any response.

26. EPA made several offers to Barkman's attorneys to assist in obtaining information responsive to the Information Request by interviewing Barkman or by reviewing documents in his possession. Barkman's counsel rejected all such offers.

27. During November, 1989, Barkman's counsel was attempting to locate and was reviewing documents to produce to EPA in response to the May 31, 1989, Information Request.

28. On December 11, 1989, 160 days after the response to the May 31, 1989, Information Request was due, Barkman submitted some documents to EPA. These documents included reports by PADER and Mr. Barkman's consultant, Nassaux–Hemsley, Inc.

29. Barkman's submission of documents on December 11, 1989, was an inadequate and incomplete response to the May 31, 1989, Information Request; no narrative or explanation accompanied the documents; numerous requested documents, such as deeds, were lacking; many of the documents submitted were not responsive to the request.

30. All documents produced by Barkman to EPA in December, 1989, were in Barkman's attorney's possession and had been there at the time he received the § 104(e) request. The EPA agent involved in the Information Request testified in a credible way as follows:

"For the most part, they were historical documents. Pennsylvania DER inspection reports from their visits to the site and their monitoring of the site under their solid waste regulations. There were some documents regarding other activities in the area; a dairy in the area, a tri-county dairy, and some reports from Mr. Barkman's consultant on some technical work that was done at the site. And, I believe, in general, that's—that's about it."

31. On February 9, 1990, EPA sent Barkman a second properly issued request for information and documents signed by Abraham Ferdas, Chief of the Superfund Remedial Branch, EPA Region III, and authorized by Section 104(e) of CERCLA, 42 U.S.C. § 9604(e).

32. The February 9, 1990, Information Request demanded that the defendant comply with the May 31, 1989, request, expressly directing the defendant to "provide any other documents or information regarding the Barkman landfill which you have not previously provided to EPA (see request set forth in May 31, 1989, correspondence)." The May 31, 1989, Information Request was attached in full to the February 9, 1990, Information Request.

33. In addition to asking the defendant to complete his response to the May 31, 1989, request, the February 9, 1990, Information Request also asked further questions on hazardous substances handled, transported, or disposed of at the Site; persons and documents with additional information; additional responsible parties; and defendant's ability to pay for any necessary cleanup. Specifically, the February 9th Information Request sought information on SCA, the company to which Barkman sold his trash hauling business, and financial statements and federal and state income tax returns. The February 9th Information Request also included a catch-all question requesting any information or documents which might relate to hazardous substances on the Site.

34. Barkman received the February 9, 1990, Information Request on or about February 13, 1990. Barkman reviewed

each question of the Section 104(e) request with his attorney within days of receiving the request.

35. At Barkman's request, EPA granted two extensions so that the response to the February 9, 1990, Information Request was due April 21, 1991.

36. Barkman submitted some documents responsive to the Information Request on March 22, 1990, and April 13, 1990, but critical information remained lacking.

37. Barkman submitted a first narrative response to the May 31, 1989, and February 9, 1990, Information Requests on April 19, 1990, 289 days after the Response to the May 31, 1989, Information Request was due.

38. Barkman's memory was the source for most of the information in his April 19, 1990, narrative response.

39. The April 19, 1990, response was an incomplete response to the May 31, 1989, and February 9, 1990, Information Requests for reasons including, but not limited to, Barkman's refusal to answer fully questions relating to hazardous substances on the Site, and his failure to provide financial information, any customer lists, employee lists, and a complete set of deeds.

40. After the April 21, 1990, deadline for a response to the February 9, 1990, Information Request passed, EPA made repeated requests, by telephone and in writing, to the defendant directing him to comply to the May 31st and February 9th Information Requests, including, but not limited to, letters on August 1, 1990, and September 19, 1990, and a memorandum on January 24, 1991.

41. On October 26, 1990, Barkman's counsel wrote EPA that his client did not object to the substance of the Information Requests but sought yet more additional time to respond.

42. After the United States filed this lawsuit on November 15, 1990, Barkman produced additional documents responsive to the May 31, 1989, and February 9, 1990, Information Requests, including but not limited to: financial statements on Novem-

ber 20, 1990; tax returns on December 14, 1990; information on property ownership on January 24th, May 29th, and November 5th, 1991; list of employees on March 19, 1991, and lists of customers on May 23 and June 21, 1991.

43. The United States took the defendant's deposition on May 29, 1991, at which time the defendant disclosed information which was from his memory but which he previously had not provided in response to the May 31st and February 9th Information Requests including, but not limited to, his ownership of companies with a connection to the landfill; his ownership of property at or adjacent to the Site; the names of additional lessees; physical structures on and below the Site, including sewer facilities and an underground petroleum tank; and the names of additional individuals who might have information about hazardous substances at the Site.

44. Barkman submitted a customer list, critical information responsive to the May 31, 1989, and February 9, 1990, Information Requests, on June 21, 1991, approximately two weeks before trial began on July 5, 1991.

45. With the exception of outstanding financial information, Barkman complied with the May 31, 1989, Information Request and the February 9, 1990, Information Request on June 21, 1991, the day the customer list was submitted, a week before trial began, approximately 717 days after the response to the May 31, 1989, Information Request was due.

46. The 1989 tax returns were produced after November 5, 1991, the day when the bench trial concluded.

47. Barkman failed to respond to the May 31, 1989, Information Request in a timely and complete manner.

48. Barkman failed to respond to the February 9, 1990, Information Request in a timely and complete manner.

## DISCUSSION

The statutory basis in CERCLA for the imposition of civil penalties is found at 42 U.S.C. § 9604(e)(5)(B) where it provides in part:

> The court may assess a civil penalty not to exceed $25,000 for each day of noncompliance for any person who unreasonably fails to comply with the provisions ... of this paragraph.

This penalty provision is applicable to the Information Requests[1] issued by the EPA on May 31, 1989, and February 9, 1990. Although Barkman is now in compliance with the Information Requests, the USA contends a penalty of $100 per day should be assessed against Barkman for unreasonably late compliance. The USA contends that 717 days of delay occurred before full compliance took place, and, consequently, it seeks a penalty in the amount of $71,700.

■ Barkman essentially admits[2] that there was a delay in compliance with the Information Requests. He urges, however, that the USA has not proved that the delay was unreasonable.[3] I find that at

---

1. CERCLA provides for Information Requests at 42 U.S.C. § 9604(e)(2) wherein it provides the EPA "May require any person who has or may have information relevant to any of the following to furnish, upon reasonable notice, information or documents relating to such matter:
   (A) The identification, nature, and quantity of materials which have been or are generated, treated, stored, or disposed of at a vessel or facility or transported to a vessel or facility.
   (B) The nature or extent of a release or threatened release of a hazardous substance or pollutant or contaminant at or from a vessel or facility.
   (C) Information relating to the ability of a person to pay for or to perform a cleanup."

2. The USA and Barkman have both submitted time lines which establish that there was exces-

sive delay in compliance. Thus, the issue of delay is not in dispute.

3. CERCLA at 42 U.S.C. § 9604(e)(5)(B) imposes a civil penalty on "any person who unreasonably fails to comply." As with all other parts of CERCLA, the USA does not have to prove that a defendant accused of violating 9604(e)(5)(B) *intended* to act unreasonably, only that he did. Once the USA has made out a *prima facie* case of unreasonable activity, the burden of proof shifts to the defendant to rebut the government's case by the proffering of affirmative defenses. *See United States v. Crown Roll Leaf, Inc.,* 1988 WL 160044, 1988 U.S. Dist. LEXIS 15785, at *18 (D.N.J. Oct. 21, 1988). Since this section of CERCLA provides for civil penalties only, the standard of proof that government

least initially the USA has established a *prima facie* case of unreasonable delay. The due date for the response to the first request was July 4, 1989, and the due date for the response to the second request was April 20, 1990. In both instances, the due dates reflect that Barkman sought and was given extensions of time to respond. Full compliance did not occur until after November 5, 1991, by which time the taking of testimony at the bench trial had been completed. Seven hundred plus days of delay is *per se* unreasonable and would ordinarily trigger the penalty provisions of CERCLA without further proof by the USA.

At this point the court would normally turn to Barkman's affirmative defenses, and weigh them against the USA's case. *See United States v. Pretty Products*, 780 F.Supp. 1488, 1502 (S.D.Ohio 1991). Barkman, however, takes the position that he is not obliged to prove his affirmative defenses by the preponderance of the evidence; he argues that the USA still bears the burden of proof and thus must prove the unreasonable elements of his actions by investigating and disproving each of his excuses.

■ Barkman relies on *United States of America v. General Laminates, Inc.*, Civil Action No. 89–497–CIV–J–12 (Middle District Florida, June 27, 1990) where the court stated:

> The court finds fault in EPA's failure to follow up on Falcone's claim that the information was unavailable to him; EPA had an obligation to investigate the validity of Falcone's assertion before seeking penalties for its failure to comply totally with its request.

On the surface, it would seem that Barkman is correct in suggesting that the USA investigate and disprove the legitimacy of his excuses. But *General Laminates* must be read more carefully. First, it must be noted that the motion before the Florida court was for summary judgment. The court was concerned primarily with whether the USA had made out a *prima facie* case based on the material facts presented to the court. The court did not criticize the USA's failure to prove, in its motion for summary judgment, that the defendant's actions were unreasonable; it criticized the USA's failure to investigate whether the events that were being characterized as unreasonable actually occurred.[4] A good insight into the court's reasoning is provided through its citation of *U.S. v. Moore*, 703 F.Supp. 460 (E.D.Va.1988), in which a motion for summary judgment for liability under § 9604(e) was denied because "factual matters [were] incapable of resolution on this motion." *Moore*, 703 F.Supp. at 463. The teaching of *General Laminates* and *Moore* is clear: the burden is on the USA to reasonably establish that the factual predicates upon which its charge of unreasonableness is based actually occurred.

■ The case before me is completely different than either *General Laminates* or *Moore*. First, the motion before me is not for summary judgment; there has already been a trial in this case. Second, there is no dispute over the factual predicates upon which the USA bases its charge of unreasonability; all that is in dispute is Barkman's and the USA's *evaluation* of those facts: Barkman thinks they support the conclusion that his actions were reasonable; the USA disagrees.[5] It is Barkman's

---

must meet is a fair preponderance of the evidence. *See United States v. Liviola*, 605 F.Supp. 96, 99–100 (N.D.Ohio 1985); *cf. United States v. Charles George Trucking Co., Inc.*, 642 F.Supp. 329, 333 (D.Mass.1986) (monetary penalty for violation of § 9604(e) is civil, not criminal).

4. In *General Laminates*, the defendant argued that it was impossible for him to have withheld certain personal tax records in either a reasonable or unreasonable fashion, since, the defendant alleged, those records simply did not exist: they had been destroyed in a fire "conducted" by the police chief of Jasper, Florida.

5. The findings of fact of the two parties are remarkably compatible. There is no dispute between Barkman and the USA that Barkman is illiterate; that he was ignorant about various requirements and facts; that there was no direct evidence of willfulness or bad faith on Barkman's part, etc. The only affirmative defense raised by Barkman that possibly requires factual verification by the USA is that the Information Requests were ambiguous. Given, however, that the USA was the author of those requests, I think that its current representation that the requests were not fatally ambiguous (or

responsibility, in the course of mounting his affirmative defense, to present these facts and demonstrate, through argument, why they support the conclusion that his actions were reasonable.

■ Now that we have disposed of Barkman's procedural objection, we can turn to the substance of his case. He has provided the court with a set of objections which ought to have been introduced as affirmative defenses to the USA's case; I shall treat them as such. Barkman raises a veritable litany of defenses including:

1. His illiteracy.
2. His financial inability to respond to a $71,700 penalty.
3. Ambiguities in the Information Requests.
4. His ignorance of the penalty provision.
5. His ignorance of his right to confer with EPA about the Information Requests.
6. The incarceration of his wife's accountant.
7. Documentation lost in his lawyer's office.
8. His ignorance that the EPA was dissatisfied with the responses Barkman did make to the Information Requests.
9. No direct evidence of willfulness or bad faith on Barkman's part.
10. EPA already had (or could easily obtain) data which Barkman failed to produce in a timely manner so that EPA was not disadvantaged by his late compliance.
11. Documents Barkman produced to EPA were lost or misplaced by EPA.

I observe at the outset that although the quantity of Barkman's defenses is impressive, the quality is not. I will discuss each defense *seriatim* and then consider all the defenses *in toto* in determining whether Barkman [6] has established legitimate excuses for the unreasonable delay.

Barkman's illiteracy is uncontested. However, there is no evidence or even any suggestion that Barkman's illiteracy had any causal connection with the delay. Therefore, this defense has little or no weight. The evidence reveals that Barkman's lawyers read the Information Requests to him and fully reviewed with him conversations and correspondence among the EPA, Barkman, and Barkman's attorneys.

Some of Barkman's excuses are directed to the amount of the penalty rather than the issue of whether the delay was unreasonable. These include his alleged financial inability to respond to a $71,700.00 penalty; his alleged ignorance of the penalty provision; his alleged ignorance of his right to confer with the EPA about the Information Requests; and lack of evidence of wilfulness or bad faith on his part. Those matters will be discussed subsequently when I analyze the issue of the level of the penalty.

Barkman's primary contention is that there were ambiguities in the Information Requests. He contends that, in framing the language of the Information Requests, the EPA "put the rabbit in the hat" by assuming that hazardous wastes were on the Site. Hence, Barkman urges that, when he is asked to identify the names of employees who have knowledge about hazardous substances at the site, he cannot answer the question because it is his position that there are no hazardous substances at the site.[7] On this point he fur-

---

could have been corrected by a phone call) satisfies any requirement based on *General Laminates* or *Moore* that the USA investigate the truthfulness of the factual predicate of its § 9604(e) claim.

**6.** The USA has the burden of proving it is entitled to a civil penalty. Thus it has the burden of proving "unreasonable" delay by a fair preponderance of the evidence. Barkman has the bur-

den of establishing his affirmative defenses to the delay by the same standard.

**7.** The text of question 6 on the May 31, 1989, Information Request is "6. Identify all persons, including your employees, who have knowledge, information or documents about the generation, use, purchase, treatment, storage, disposal or other handling of hazardous substances at or transportation of hazardous substances to the Site." (*see* Exhibit 6.)

ther urges that pollution around the site was caused by activity off of his land at a quarry and at a location where a dairy dumped emulsifiers from its tank trucks after the tank trucks were cleaned. The difficulty with Barkman's position in this regard is that he easily could have identified the names and addresses of his employees while noting that he disagreed with the position of the EPA that hazardous materials were connected with the site. Also, it must be noted that PADER and the EPA found hazardous substances on and around the site from the early 1980's and the EPA listed the site on the "NPL" in 1984 (*see* Finding of Fact 10). In fact, it is clear that Barkman had twenty-six 55 gallon drums of liquid hazardous substances stored on the site in 1984. Consequently, the EPA had every right to assume, for the purposes of framing Information Requests that hazardous substances had been on the site and were released from the site. Barkman could answer the question relating to the identification of employees who had knowledge of hazardous substances by identifying the employees who worked with the substances on the property while disclaiming that the substances were hazardous. This is a matter which could have easily been clarified by conferences with the EPA. Barkman and his advisors rejected the opportunity to have such conferences.

Barkman complains that the delay in producing the 1989 income returns and financial information for that year was reasonable because his wife's accountant had been incarcerated and Barkman could not get information about another business his wife operated. The incarceration of his wife's accountant is no excuse for Barkman's failure to disclose his own financial data to the EPA.

Barkman has clearly established that the closing documents in regard to his sale of a portion of his trash business to SCA were lost in his attorney's office. He is also correct that, when his attorney found these documents, the documents were promptly turned over to EPA. Consequently, the delay in producing the closing documents, which included a list of trash customers, is not unreasonable.

Barkman complains that the information the EPA sought included data it already had or could easily obtain. There is some merit to this excuse. Title information from the Recorder of Deeds Office and the Tax Assessor were available to the EPA. Nevertheless, the EPA has a right to ask Barkman to disclose the deeds conveying the real estate into his name or his name and his wife's name or into the names of corporations controlled by him. Also, the EPA request sought some information which was already in its possession. Nevertheless, the EPA is entitled to seek this information from Barkman. This later point, that the EPA already had some information, is also an argument related to the level of the penalty.

In regard to the claim that the EPA lost or misplaced documents that Barkman produced, I hold that the EPA did not lose or misplace any documents that had major significance in this controversy.

On balance, Barkman's excuses do not render the seven hundred plus days of delay reasonable. There is some justification for some delay. There is some justification for not responding to some of the Information Requests. The overall delay here, however, both as to duration and scope, is unreasonable *per se* and Barkman's excuses are insufficient to change that conclusion.

What remains is to set the amount of the penalty. Courts often refer to five factors to consider in determining whether or not civil penalties should be imposed and, if so, at what level. These include: (1) the good or bad faith of the defendant; (2) the injury to the public; (3) the defendant's ability to pay; (4) the desire to eliminate the benefits derived by a violation; (5) the necessity of vindicating the authority of the agency in question. *United States v. Reader's Digest Ass'n*, 494 F.Supp. 770, 772 (D.Del.1980), *aff'd*, 662 F.2d 955 (3d Cir.1981), *cert. denied*, 455 U.S. 908, 102 S.Ct. 1253, 71 L.Ed.2d 446 (1982); *see* also, *United States v. Papercraft*, 540 F.2d 131, 141 (3d Cir.1976). Stated in another way,

the level of a penalty should reflect the seriousness of the underlying offense and the resources of the defendant.

The EPA has admitted in answers to interrogatories that it does not contend that Barkman acted wilfully or in bad faith. Nevertheless, there is an aura about this controversy which suggests Barkman was deliberately uncooperative with the EPA. Thus, the first factor favors the imposition of a substantial penalty. The second factor dealing with injury to the public also suggests the imposition of a substantial penalty. Public monies have been spent to rectify environmental problems at the Site and the public has been thwarted in its efforts to obtain information about the generation and release of these substances. The third factor relates to the defendant's financial condition. Although defendant has a cash flow problem, he has substantial assets. Therefore, the defendant can pay a substantial penalty. I discount the testimony of the certified public accountant who testified on this issue because he relied on Barkman's data and made no independent investigation or review.

The fourth factor suggests that the defendant be prevented, by the imposition of a penalty, from enjoying any fruits he derived as a result of his delay. The only benefit to Barkman as a result of the delay is the delay in being made responsible for the clean-up costs. That is a separate proceeding and interest can be applied there. Consequently, this factor is not a basis for the imposition of a substantial penalty. The final factor relates to the necessity to vindicate the authority of the EPA. Barkman's deliberately inadequate cooperation supports the imposition of a substantial penalty.

I calculate the penalty as follows. I round off the number of days to 700. I find that $55.00 per day is an adequate penalty within the financial ability of the defendant to absorb. Although it is less than the government seeks, it is sufficiently high to deter others who might be tempted to act as Barkman has in this case.

I reach the following:

## CONCLUSIONS OF LAW

1. This court has subject matter jurisdiction over the controversy.

2. Proper venue lies in this court.

3. This court has *in personam* jurisdiction over the parties who have appeared here in person and through counsel.

4. Barkman's delay of over 700 days in answering completely the Information Requests of the EPA constitute, by virtue of the duration itself, an unreasonable delay.

5. Barkman's excuses for the delay, although in some instances legitimate, on balance do not excuse the unreasonable nature of the delay.

6. Applying the five factors used to quantify the penalty, an appropriate penalty in this case is $38,500.00.